## THE BORDENTOWN.

### THE WINNIE.

### THE WILLIE.

*(District Court, S. D. New York. December 24, 1889.)*

1. TOWAGE—NEGLIGENCE.
   The tugs Willie, Winnie, and B., all under the control of the latter, and all belonging to the same owners, took in charge a fleet of canal-boats, loaded with coal, to be towed from South Amboy, through the Kills, to New York. The wind was N. E. at the start, increased afterwards, and was nearly a gale when the tugs reached the mouth of the Kills. They proceeded on, however, and the canal-boats were after-

wards mostly lost in the upper bay, through the heavy sea. the sinking of some, the pounding of others, and the general breaking up of the tow. *Held*, that it was negligence to leave the Kills and to attempt to cross the bay in such weather; that the tugs ought to have ascertained the facts as to the weather before leaving the shelter of the Kills and going into the bay, or to have turned about, as they might have done, near the mouth of the Kills. and have taken refuge at Port J., in the Kills; and that the owners of the tugs were liable for the loss of the tow.

2. SAME—LIMITATION OF LIABILITY OF OWNER.

In section 4283 of the Revised Statutes the words "such vessel" include all the tugs belonging to the same owner engaged in the work of towing at the time when the fault is committed by the common captain or head of all the tugs; and all such must be surrendered, as a condition of the limitation of the owner's liability. In this case, *held*, that both the B. and Winnie must be surrendered, but not the Willie, inasmuch as she had been previously detached, and was no part of the moving force at the time when the negligence arose that caused the loss.

3. SAME—DEVIATION—PARTIAL SURRENDER—DAMAGES—PROXIMATE CAUSE.

The Willie had been ordered to detach the canal-boat C. from the rest of the above tow, to be taken to Newark, and not out into New York bay. The Willie negligently omitted to detach the C., and she was taken by the B., with the rest of the tow, into New York bay, and lost. *Held* a wrongful deviation, upon an unauthorized trip, as respects the C., arising through the Willie's negligence, and such a wrongful act and breach of contract as would make the Willie's owners responsible for the C.'s subsequent loss, even if it had arisen from subsequent additional negligence on the part of tugs belonging to different owners; and that the owners of the Willie, being liable for the full amount of the C.'s loss, could not limit their liability under the statute, as respects the C. and her cargo, except on the surrender of the Willie to that extent.

(*Syllabus by the Court.*)

In Admiralty. Petition for limitation of liability.

*Biddle & Ward*, for the Pennsylvania Railroad Company, petitioner.

*Wilcox, Adams & Macklin*, for five of the canal-boats, and others.

*Carpenter & Mosher*, for the Western Insurance Company, and others.

*Wing, Shoudy & Putnam* and *Mr. Burlingham*, for the Lehigh Coal & Navigation Company, and others.

*Clark & Bull*, for the China Mutual Insurance Company, and others.

*Hyland & Zabriskie*, for the Cahill.

*William J. Kelly*, for the Philadelphia & Reading Railroad Company.

*T. C. Campbell*, for the Hanagan.

BROWN, J. On the night of November 24 to 25, 1888, the steam-tug Bordentown, assisted by the Winnie, having in tow a fleet of about 20 canal-boats, bound from South Amboy, through the Kills, to the sea fence, Brooklyn, encountered, on leaving the Kills, a heavy north-east gale, in which all but two of the boats were lost. Large claims for damages having been presented against the Pennsylvania Railroad Company, the petitioners, as owners of the tugs, charging that the loss was occasioned through negligence, a libel and petition were filed in this court to limit the liability of the company for the alleged losses, in case they were held answerable at all, to the value of the Bordentown, the Winnie, and the Willie, or one or more of them, as might be adjudged. The libel further denied that the disaster was caused through any negligence of the tugs, and alleged that, if it was so caused, it was without the privity of the petitioners. The evidence taken is voluminous. It is not necessary to state more than the leading facts that I deem pertinent to the conclusions reached.

The tow left South Amboy between 5 and 6 o'clock of the evening of November 24th, in charge of the Willie and the Winnie,' and had at that time two or three additional tiers of boats, which, just below the Baltimore & Ohio bridge, were detached by the Willie, and afterwards landed by her safely at the Standard Oil Company docks, near Port Johnson, in the Kills, and did not proceed further. The Bordentown, a large and powerful tug, but old, out of date, and expensive to run, took charge of the fleet soon after it left South Amboy. The Winnie acted as a helper throughout, running ahead, upon a hawser attached to the Bordentown. The wind had been north-east for two or three days previous. When the tow left South Amboy the wind was already somewhat fresh, and there was some rough water in crossing the bay at that point. In passing Newark bay at about midnight, the wind was strong from the north-east, and the water was so rough as to wash up on the decks of the boats on the port side, some of which took in water enough to make them careen. This was partly rectified by the men on board shifting the cargo. The canal-boat Cahill was attached, as an extra boat, outside of the line of the port boats of the tow, and was designed and ordered to be left at Newark bay. She was not left there, but was taken out into the bay, and was subsequently lost. After passing Newark bay, owing to the shelter from the land, no rough water, or other difficulty, was experienced until the mouth of the Kills was reached, about a mile to the westward of Robbins' Reef light, where the water was found to be rough, and the wind blowing strong from the north-east. The Bordentown and her helper, however, kept on, intending to go up and across the bay, about four miles, to the sea fence, Brooklyn. Many of the men on board the canal-boats made signals, by swinging lanterns, shouting, and blowing horns, to indicate that they were having trouble, and were taking in water from the heavy sea. Some of the boats had covered decks, or hatches with the covers fastened down, which, though washed by the sea, experienced no immediate injury therefrom. Most of the boats, however, had open decks, or their hatch-covers were off. The signals from the tow were either not seen or not heeded on board the tugs; but, after going out a little beyond Robbins' Reef light, the Bordentown turned the tow about under a starboard wheel, and, as her witnesses testify, directed her course towards the American docks, about a quarter of a mile below the landing at St. George's ferry. This was done, according to their testimony, on account of the alleged change of the wind to the westward, which would make it unsafe to moor the tow at the sea fence. At this time it was ebb-tide at the mouth of the Kills, and slack water on the westward side of the bay. After proceeding perhaps a half mile towards the American docks, the wind being observed, as the petitioners' witnesses testify, to have hauled again to north-east, which would make the American docks unsafe, the tow was turned to the north-west, towards the Kills, under a port wheel, but had not proceeded far on that course when she was met by the Willie, whose captain had come down from Port Johnson, or from the Standard Oil docks, after having landed his detachment of the tow at that point, to render any assistance to the Bor-

dentown that might be needed. He testifies that he reported to the pilot of the Bordentown that the water was very rough up at the mouth of the Kills, but did not give any advice. The pilot of the Bordentown testifies that he stated that the water was too rough to go in that direction. The pilot of the Bordentown, accordingly, determined to try again to go to the sea fence, and again turned to cross the bay. He had proceeded for a time upon this course, drifting somewhat downwards, and, when about a mile to the south-east of the bell buoy, the canal-boat Hughes, the hawser boat on the port side, became so full of water that she sank head downwards, and parted the hawser. The result was that the whole tow got loose from the tugs, became kinked up, and pounded each other in the heavy sea, and the open-deck boats, one after another, rapidly filled and sank. The Winnie rescued one boat, and took her to a place of safety; the Willie, two others. The Bordentown was difficult to steer; and, in approaching and lying alongside of some of the other boats, she broke one of the links of her rudder backing-chain, which partially disabled her. In consequence of this accident, the Bordentown's pilot deemed it imprudent to attempt anything further than to rescue the lives of the men on board the canal-boats, who were accordingly all taken on the Bordentown, and safely landed upon a dock in the vicinity of Fort Hamilton. The rest of the tow that had not sunk were left adrift, and mostly lost.

The immediate cause of this misfortune was the sinking of the Hughes, the port hawser boat. She had an open deck, supplied with 18 hatch-covers, but her cargo of coal was so full that the covers could not be fastened down when need for it was found. Had a safer boat been in the place of the Hughes, and the Bordentown kept on, as at first, without turning, it is not impossible that she might have crossed without the loss of any of the boats. There can be no doubt, however, that from the time the mouth of the Kills was reached, there was a strong gale, and a very rough sea. It was at that time nearly 2 o'clock, and the evidence of the Staten Island Ferry pilots furnishes outside proof of the violence of the gale at that time. In judging of the prudence of the Bordentown in attempting to cross the bay in such a gale and such a sea, regard must be had to the condition and make-up of the tow she had in charge; and, considering that so many of them were deeply loaded, had open decks, and that the port hawser boat was of that kind, and was so loaded that her hatch-covers could not be put down, I can have no hesitation in finding that it was imprudent and unjustifiable to attempt to come out of the Kills, in the face of such a wind and sea. It is urged that, as the tide in the Kills was at that time ebb, the tow had no alternative but to keep on, because there was no room to turn in the Kills. This is not a sufficient justification. The evidence taken on the part of the respondents satisfies me that there was room to turn this tow before going into the rough water; and, even if it were a fact that there was not room, that would not furnish a justification, but only throw the fault further back, in not ascertaining whether the wind and weather were proper to proceed, before going so far as to make escape

from destruction impossible. Under the present means of communication and observation, it is very easy to learn the state of the weather at the mouth of the Kills before passing Port Johnson, and reasonable prudence would plainly require that it should be done. If no telegraphic communication was established or was available, there was nothing to prevent the Winnie from steaming ahead, ascertaining the facts, and reporting. I think the petitioners are, therefore, liable for the imprudent and negligent navigation of their employes in taking the tow out into the bay under circumstances which the tow was wholly unfit to encounter. *The M. M. Caleb,* 10 Blatchf. 471. It is not necessary to express any opinion as to the subsequent management in the various turns that were made, in the endeavors to rescue the tow from a situation which was found to be dangerous. Under such circumstances, much must be left to the judgment of the person in command of the tug. There is considerable conflict in the testimony as to the condition of the water at the time the tow made her last turn to cross the bay. I think that the weight of testimony is that the sea was still rough and dangerous; and, considering that the distance to the smooth water of the Kills was far less than the distance to the sea fence, it seems to me that a great mistake, at least, was made in the last attempt to cross the bay. The situation, however, was somewhat analogous to a situation *in extremis.* The real fault was in bringing the tow into that situation.

2. While finding the petitioners liable for the loss, I must further find that they are also entitled to a limitation of their liability, under the act of 1851, (Rev. St. § 4283;) because I cannot, upon the evidence of the respondents, come to the conclusion that there was any negligence in the dispatch of the tow from South Amboy at the time it was sent out, or any insufficiency of the tugs for the purposes of an ordinary trip to New York. The tugs were not dispatched under any peremptory directions to make the trip through without regard to the weather. On the contrary, it is plain that the management of the tow was under the direction of the pilot of the Bordentown; that he had the entire authority, and that it was his legal duty to take the tow with reasonable prudence, and to proceed, or to lay up at any point on the route, as the weather might require. The Willie laid up her detachment near Port Johnson. Another Amboy tow, on the same evening, did the same. The imprudence that caused the loss was simply the imprudence of the pilot of the Bordentown in proceeding into the bay under circumstances when he ought to have stopped short of it. His relation to the petitioners was in this respect, therefore, no different from the relation of the master of any vessel who brings responsibility upon her owners through his negligence or misconduct. The owners, the principals, are entitled to a limitation of liability, where they have no personal privity with the immediate cause of the loss. That is plainly the case here. It is not necessary, therefore, to inquire what grade of officers, in the case of a corporation, it must be to make their knowledge or privity the knowledge or privity of the corporation. Even if the corporation would be chargeable for the running of an unfit boat by the direction of its sub-

ordinates, I cannot find that the Bordentown was unfit, by reason of her age or of any other cause, to be dispatched with a tow to New York, in any weather that was suitable for the tow to enter the bay. It was wholly the improper course of the master of the tow in going out into the bay which brought about the disaster; and, as against this imprudence, the corporation is entitled to a limitation of its liability.

3. As regards the vessels required by the statute to be surrendered in a case like the present, there can be no doubt that the Bordentown is one of them. The master of the tow was all the time on board of her, directing the navigation of all. I have no doubt that the Winnie, also, must be included. At the time when the master's fault arose, the Winnie was as much a part of the moving power as the Bordentown, and was equally under the same direction. She belonged to the same owners; and from the beginning to the end she was engaged, in the owners' behalf, in the work of towing the other boats, precisely as the Bordentown was engaged. It was immaterial on board which tug the master, for the time being, was, or from which boat his orders were given. Both as related to the owners of the tugs and as related to the owners of the boats in tow, the Bordentown and the Winnie, in taking the tow through to Kills, were in effect one vessel. In the case of *The Connecticut* and *The S. A. Stevens*, 103 U. S. 710, where those two vessels were towing a third, which came in collision with the Othello, the Stevens, which was the helper of the Connecticut, was exempted from liability, though the Connecticut was held for not signaling her movements. But that duty rested upon the Connecticut alone. An examination of the record in that case shows that the Stevens did not belong to the owners of the Connecticut, but was an independent tug, hired for the occasion, simply to supply additional motive power, as a helper, and that she had done so, without any fault on her part. Had the Stevens been owned by the same owners as the Connecticut, and engaged in the same work, under a single directing master, the case would have been analogous to the present. Where all the tugs employed belong to the same owner, and are under one common direction, and are engaged in the service at the time when the fault is committed, they are in the same situation, as it seems to me, as a single vessel, as respects responsibility for the negligence of the common head. The words "such vessel," in section 4283, embraces all such tugs. Rev. St. § 3; *The Arturo*, 6 Fed. Rep. 308. And all such must respond for the damages in proceedings for limitation of liability. An additional reason for holding the Winnie in this case is that she was needed to supply the poor steerage power of the Bordentown, and, I have no doubt, was in part retained for that purpose. Acting as a rudder for the Bordentown, she was in a special sense a part of the moving power. As respects the tug Willie, I think there is not sufficient to hold her; because, at the time when the real fault in the case was committed, viz., when going out into the bay, she was no part of the moving power, but was several miles distant, engaged in taking care of a separate detachment of the tow. After securing their safety, she came out of the Kills, for the purpose of giving help to the Bordentown, if

needed, and met her, attempting to come back into the Kills with the tow. If it were certain that the tow would have been saved by keeping on into the Kills, or that the Willie had caused, by any independent act of her own, the master of the Bordentown to turn again and attempt to cross the bay, doubtless the Willie would be chargeable. But there is not sufficient evidence of the latter, and there is no certainty as respects the former. It should be observed that all the witnesses who speak of the comparative smoothness of the water on the return, while going towards the Kills, were on the lee side. The witnesses on the weather side testify that it was becoming rougher as they went towards the Kills, against the tide. The most proper view, as it seems to me, to take of the situation when the Willie reached the Bordentown is that the tow was already in a desperate situation, through the Bordentown's previous fault; that the Willie came and offered, as it was her duty to do, all the assistance she could render, subject to the direction of the master of the Bordentown, as to any course he thought fit to pursue under the circumstances. As before stated, the situation was one that called particularly for the exercise of the master's judgment upon the spot; and, though it now would seem to have been a great mistake to turn back again to the eastward, I do not feel authorized to adjudge it a legal fault and negligence, rather than an error of judgment. If this view is correct, the Willie ought not to be held. Since no legal fault is deemed committed while she was a part of the moving power, she cannot be required to be surrendered simply for going to the rescue of boats in a desperate situation. The result is that the petitioners are entitled to a limitation of liability on accounting for the value of the Bordentown and the Winnie, with interest from the time of the loss.

Though the Willie is not held for the general loss of the tow, she must be held for the loss of the Cahill and her cargo, because she had specific instructions to leave that boat at Newark bay. These instructions constituted an appropriation of the Willie to perform the general contract, previously entered into by the petitioners, to tow the Cahill to Newark. That boat, as above stated, was placed on the port side, towards the forward part of the tow, for the purpose of being detached and left, as ordered. Contrary to these instructions, and without reason, so far as it appears, the Cahill was carried out into the bay, and lost. It was the Willie's duty to perform her specific instructions; and, as nothing prevented her doing so, she must be held answerable for the loss of the Cahill in these proceedings. It is urged that, though the Willie was negligent, her negligence was neither the proximate nor the natural cause of the subsequent loss; but that this loss arose from a new and independent cause, not to be anticipated, viz., the negligence of the Bordentown, as the court holds, in going out into the bay. I cannot sustain this contention. If the Bordentown, from the time when the Willie was detached, were regarded as an independent tug, belonging to different owners, still the petitioners, as owners of the Willie, which had taken the contract to deliver the boat at Newark, or to leave her at a suitable place therefor, would be personally responsible for the failure to do so.

This failure is a breach of their contract. The loss to the owners of the Cahill from this breach of contract is a total loss; and the petitioners could not set up, in diminution of damages, the negligence of the Willie, their own servant, in wrongfully permitting another tug to take the Cahill away upon an unauthorized trip. This exposed her to new sea perils, and to additional risks of negligence on the part of those having charge of her. These new risks were the direct and necessary result of the Willie's negligence; and from these risks the Cahill was, in fact, lost. The owners of the Willie must therefore answer personally for the loss, as the direct consequence of their negligence. As between them and the owners of the Cahill, the loss was the direct consequence of the Willie's negligence. The owners of the Cahill could not be turned over to their remedy against the Bordentown and her owners, merely because there was also an independent act of negligence on the part of the Bordentown. If goods are stolen from a negligent warehouseman, the immediate cause of the loss is the act of the thief, nor is theft the necessary result of such negligence; but the warehouseman is liable for the loss, for his breach of contract, and neglect to keep with proper care, because he negligently exposed the goods to a natural liability to loss. It is the same with the Willie and her owners, as respects their duty to have detached the Cahill at the proper place to go to Newark. Having negligently omitted to do that, and having wrongfully suffered her to go on with the rest of the tow, and become exposed to wholly new risks, the owners of the Willie, and not the owners of the Cahill, must bear all those subsequent risks that naturally attended their unauthorized acts. The maritime law is the same. A vessel deviating on her voyage must bear all the risks of subsequent accidents. The same rule is applied to forwarders, who are not under the obligations of common carriers. 1 Pars. Shipp. & Adm. 171, note 4, and cases cited; *Goodrich v. Thompson*, 4 Rob. (N. Y.) 75, 85, affirmed 44 N. Y. 324; *Bazin v. Steam-Ship Co.*, 3 Wall. Jr. 229; *Goddard v. Mallory*, 52 Barb. 87; *Marx v. Steam-Ship Co.*, 22 Fed. Rep. 680; *Phillips v. The Sarah*, 38 Fed. Rep. 252. This is not a loss by the act of God, as in *Railroad Co. v. Reeves*, 10 Wall. 176; but the loss arose by a continuous and natural sequence of events set in motion, not by any new intervening agencies, but directly by the Willie's own tortious act, as in *Railway Co. v. Kellogg*, 94 U. S. 469, 476. The agency of the Bordentown was an agency to which the Willie directly and wrongfully committed the Cahill; and I know of no principle or authority that, under circumstances like these, would exonerate the petitioners from responsibility for the consequent loss. The petitioners, being, therefore, responsible for the loss of the Cahill and her cargo by reason of the Willie's negligence, can only be exonerated from this liability under the statute by the surrender of the Willie, so far as necessary to pay that demand. Otherwise the Willie is free. A decree may be prepared in accordance with this decision.