## THE WYOMING.
### No. 229.

District Court, D. Massachusetts.
May 16, 1932.

Single & Single, of New York City, for plaintiff.

Bingham, Englar, Jones & Houston, of New York City, and Burnham, Bingham, Gould & Murphy, of Boston, Mass. (Foye M. Murphy, of Boston, Mass., of counsel), for defendant.

BREWSTER, District Judge.

By this libel the libelant seeks to hold the tug Wyoming liable for the loss of cargoes of coal on barges 801 and 806 which sank in Block Island Sound on the morning of November 12, 1927, while being towed by the tug.

### Statement of Facts.

Barges 801 and 806 were each loaded at Perth Amboy, N. J., with about 575 tons of coal. Their respective destinations were Woods Hole, Mass., and Pawtucket, R. I. These barges, together with two other barges, 780 and 704, were towed to New London by another tug which had become disabled. The Wyoming was sent to pick up the barges at New London and tow them to their destinations. 780 was a wooden barge, and 704 was built of steel. Each had a capacity of 1,625 tons and carried three masts, sails, rudder, and steam gear for handling hawser and anchor. 801 and 806 were of wood, each 136.5 feet long, 30.3 feet wide, and neither had masts, sails, or steam power. They were built in 1888, originally for outside sea duty. They were constructed with sharply rounded bows, and each was equipped with steering gear and rudder and with two pumps. The freeboard of these barges when they left New London was 2 feet 6 inches. A master and deck hand were on each barge. Barges 801 and 806 had not for some time been used for outside sea work, and within a year their carrying capacity had been cut down. They were apparently in good condition for old barges, and, so far as the tug knew, they were fit for a voyage under favorable conditions. Both barges leaked somewhat, but not more than could readily be pumped. When the barges were in New London, there was a few inches of water in them, and the pumps were used with the result that, when Race Rock had been reached, the water had been entirely pumped out. The Wyoming arrived at New London about 3 o'clock on the morning of November 12, 1927. The captain of the tug inquired of the masters of the barges whether they were in readiness to proceed, and, upon receiving an affirmative reply, he took the barges in tow and got under way about 5 o'clock a. m. The four barges were towed

tandem in the following order: 780, 704, 806, and 801. 780 and 704 were on about 175 fathoms of hawser and 806 and 801 on about 125 fathoms. The tow proceeded down New London Harbor and passed Race Rock at 7 o'clock a. m. After passing Race Point, the tug took a direction E. ½ N. through what is known as the "Race" into Block Island Sound, and passed Watch Hill at 8:50 o'clock a. m. At about 10:50 o'clock a. m. a distress signal was hoisted on barge 801, and shortly thereafter a like signal was displayed on barge 806. The tug thereupon took in her hawser, letting 780 and 704 continue easterly under sail, towing 801 and 806. The tug went back to the barges, and, in response to their request, took off the crews of both 801 and 806. The sea was then so rough that it was not considered safe to bring the tug alongside the barges, and lines were thrown to the men by which they were pulled through the water to the tug. The tug then again picked up the tow and had gone a short distance when, at 11:40 o'clock a. m., barge 801 foundered and parted its hawser. The tug then turned back with her tow in order to save, if possible, 806, but the barge was "too far gone," and it sank about an hour later.

The barges sank at a point about 15 miles easterly from Race Point, about 5¾ miles northwesterly of Block Island, and about 10 miles southwesterly from Point Judith, which was the most accessible harbor of refuge. After the barges had foundered, the tug proceeded with the two remaining barges, encountering no further difficulties. There was no evidence that the barges were at any time towed at an excessive rate of speed.

The reason for the distress signals was the discovery by those on board 801 and 806 that they were leaking more than usual and were filling so fast that the crews were fearful that they could not keep afloat by the use of pumps.

The only probable cause for the development of the excessive leaks was the pounding and buffeting of the barges in the heavy seas which were more than they were able to withstand. It is highly improbable that the cause was accidental. A similar accident would not have befallen both barges at the same time.

I concur with the proctor of the libelant when he says: "If one vessel foundered there might be room for speculation, but when two barges of the same age, construction and capacity sink within an hour of each other in seas that concededly are rough, the inference is irresistible that the foundering was due to the stress caused by the seas."

The established facts admit of only one inference, and that is that the barges, while apparently seaworthy and able to stand up against ordinary conditions of weather and sea, were not sufficiently staunch to stand the punishment which they received after they were in Block Island Sound. I find, therefore, that the cause of the leaks which resulted in the sinking of the barges was the continual buffeting and pounding which they encountered after the sea became, to use the language of the captain, "a choppy sea."

The specifications of negligence which merit consideration are: (1) Negligence in leaving the harbor of New London; (2) negligence in proceeding after passing through the Race; (3) negligence in proceeding after the distress signals had been hoisted and the men taken from the barges.

The further facts bearing upon these specifications of negligence gathered from the evidence are that the captain of the tug knew that the barges were old, but he had no knowledge that they were not in a reasonably good state of repair. He believed them to be seaworthy. If any extraordinary or excessive leaking had been discovered before the distress signals were seen, he was not advised of it.

A light southwesterly wind was blowing. A northwesterly or westerly wind is more favorable for a tow proceeding easterly through the Sound. The tide was ebb, a desirable state of tide for a tow passing easterly through the Race. The tug was also chargeable with knowledge that the tide would run unusually strong because of a full moon three days before ; that soon after passing the Race the tide would change to flood, and that a flood tide, acting against a southwest wind, would result in a choppy sea, which would increase not only as the velocity of the wind increased but as the tow passed easterly beyond the protection of Montauk Point. The tide that morning changed from ebb to flood at 6:57 o'clock. The early morning of November 12 was clear. No storm warnings had been displayed at New London or at any station along the Sound. From midnight to 2 o'clock a. m. the barometer had remained steady at 30.08. On the evening of November 11, as the tug came up Long Island Sound, the barometer had remained at 30.10. The evidence does not disclose how the barometer stood when the tow was being made ready in New London. The first reading logged after 2 o'clock a. m. was at 7 o'clock a. m., when the tug passed Race Rock. By this time it had dropped to 29.98. The captain testified that he frequently observed the barometer, but only logged the readings when he passed

some definite point, and that the fall of 10/100 of a degree had been gradual. As was to be expected, the sea was smooth until after the tow passed Watch Hill at 8:50 o'clock. In the meantime the wind, still in the southwest, had increased, and the sea had become choppy.

The witnesses are not in full accord as to the force of the wind after passing through the Race. Naturally the captain of the tug, in his testimony, sought to minimize the action of the wind and tide and the adverse conditions which confronted him, but from the evidence I am satisfied that as early as at Watch Hill the sea began to be rough, and as the tow went further eastward the sea became more rough until at the end the stress of the weather had opened seams in the barges which resulted in the foundering. Notwithstanding these conditions, the tug went ahead for nearly two hours, when, at 10:25 o'clock, the first signal of distress was seen. When the trouble was first discovered, the tow was nearer to Point Judith than either the New London Harbor or the lee of Montauk Point. The tug had only proceeded about half an hour before the first barge sank.

### Conclusions of Law.

■■ The duty of the tug toward the tow has recently been reiterated in the case of Stevens v. The White City, 52 S. Ct. 347, 76 L. Ed. —— (decided United States Supreme Court, March 14, 1932), where it is stated that, while the tug is not an insurer or liable as a common carrier, it owes to the tow the duty to exercise such reasonable care and maritime skill as prudent navigators employ for the performance of similar service. The burden is upon the tow to show that the loss for which recovery is sought was caused by a breach of that duty.

■ We are not concerned here with the condition of the foundered barges except so far as such condition was apparent or brought home to the tug, nor are we concerned with the wisdom of the crews on the barges in abandoning them. Stevens v. The White City, supra.

° The questions presented are whether the tug exercised "reasonable care and maritime skill" as a prudent navigator (a) in setting out from New London in the early morning of November 12, 1927; (b) in continuing on after it became apparent that heavy seas were likely to be encountered; and (c) in failing to turn around and seek the lee of Montauk Point, or returning to New London Harbor after it appeared that the barges were in trouble.

■ There is no room for doubt that the barges sank because they filled with water which came in through leaks that had developed after the vessels had been towed some two hours, or about 10 miles, through a "choppy sea." The evidence compels the conclusion that the leaks were due to strain put upon wooden barges, which had been in service for nearly 40 years, by the constant pitching and pounding experienced in rough waters. The trip turned out to be one attended with disaster to two barges whose seagoing qualities were inadequate to the demands of the situation. The degree of caution required of the navigator of the tug in approaching the hazards of wind and sea must be measured with reference to the known character of the tow. The Mercury (C. C. A.) 2 F.(2d) 325; The Gypsum King (D. C.) 279 F. 297.

The barges were old wooden vessels whose carrying capacity had been reduced, but they were seaworthy so far as being in a good state of repair. We have here a situation somewhat similar to that before the court in the case of The Mercury, supra, where the court said: "It is plain that, under the rule of reasonable care and prudence, a navigator handling such a tow could not take large chances as to bad weather in coming up the Atlantic Coast in December."

■ It is my opinion that this rule of reasonable care and prudence did not, under the circumstances of the case at bar, require the tug to refrain from setting out from New London. At that time the weather was clear; the barometer had fallen little, if any. There were no storm signals. The water was calm, and there were no indications that the tow would meet with any unduly hazardous conditions except the fact that the wind was southwest and would cross a flood tide soon after the tow passed into Block Island Sound.

The captain of the tug, however, must be chargeable with knowledge of the fact that the tide was running strong; that the season was in November; that the southwest wind crossing the flood tide would result in a choppy sea. These conditions, while not sufficient to lead a prudent navigator to stay in New London, did require the exercise of extreme caution in continuing after it became apparent that the barometer was falling, that the wind was increasing, and that the sea was becoming increasingly heavy.

If the captain of the tug, as a reasonably careful and skillful navigator, should have foreseen the conditions which were actually met in time to turn back before the damage had been done, it was clearly his duty to do

so. The Benjamin H. Whorford (D. C.) 290 F. 816.

■ The real question, which is concededly a somewhat close one, is whether, after passing Watch Hill and the captain had noted the fall of the barometer, and that the wind had not shifted from southwest to the west as he had anticipated, but was blowing stronger, he was justified in going ahead, knowing, as he was bound to know, that the sea would become more rough as he proceeded easterly. It is my opinion that a reasonably prudent and skillful navigator would have avoided subjecting that particular tow to the hazards of the waters which he was reasonably sure to encounter if he continued.

In principle, the case at bar is very similar to the cases of The Bordentown (D. C.) 40 F. 682; The Vandercook (D. C.) 65 F. 251; Tucker v. Gallagher (D. C.) 122 F. 847; The Benjamin H. Whorford, supra; and The Katie E. (D. C.) 46 F.(2d) 534.

■ With respect to the course of conduct pursued by the captain of the tug after the barges were in trouble, I am unable to find any act of negligence or any failure to exercise all reasonable diligence and care in meeting the emergency which confronted him. In electing to continue on toward Point Judith, instead of turning around and seeking the shelter of Montauk Point or New London Harbor, his election can be held to be no more than an error of judgment not amounting to negligence. In my opinion, it was not even an error of judgment, but, whatever view may be taken of the matter, his acts did not contribute to the loss of the barges, because they did not remain afloat a sufficient length of time to enable him to have reached either of these havens of safety.

To summarize my conclusions of law, I rule (1) that the tug was not negligent in leaving New London on the morning of November 12; (2) that no negligence can be attributed to the tug by reason of the course followed by the tug after the distress signals were hoisted; and (3) that the tug was negligent in proceeding after it first became apparent that the wind was still coming from the southwest, that it was increasing in velocity, and that the barometer was falling, which, combined with a strong flood tide, required a forecast of rough waters which would increase rather than decrease as the tow proceeded easterly.

I find and rule, therefore, that the tug is liable for the loss of the cargoes which were carried in barges 801 and 806.