### THE STIRLING TOMKINS.
### THE EDWIN TERRY.
### THE BEAR.
### CHARLES E. PEARSALL & SON, Inc., v. CORNELL STEAMBOAT CO.
### TRANSMARINE TRANSPORTATION CORPORATION v. SAME.

Nos. 382, 383.

Circuit Court of Appeals, Second Circuit.
June 14, 1937.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (Robert S. Erskine and Henry P. Elliott, both of New York City, of counsel), for appellant.

Morgan & Lockwood, of New York City (Mark W. Maclay, of New York City, of counsel), for appellee Charles E. Pearsall & Son, Inc.

Bigham, Englar, Jones & Houston, of New York City (Charles A. Van Hagan, Jr., of New York City, of counsel), for libelant-appellee Transmarine Transp. Corporation.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

While northbound in the Tappan Zee in the Hudson River in the head tier of a 35-boat flotilla in tow of the respondent's tug Sterling Tomkins assisted by another of its tugs the Edwin Terry, the steel canal barge Transmarine No. 126, owned by the libelant Transmarine Transportation Corporation and loaded with scrap iron, of which the libelant was bailee, foundered in a heavy sea and sank early in the evening of April 17, 1932. About an hour and a half before that a pile driver, attached to the rear of the flotilla at the right side and owned by libelant Charles E. Pearsall & Son, Inc., had broken away unnoticed by the tugs and drifted aground on the east bank of the river below Turner's dock at Irvington. At or about the same time a pile scow also owned by the last mentioned libelant was damaged by pounding though one of her lines held and prevented her drifting ashore.

To recover the damages sustained by the pile driver and pile scow, their owner sued the respondent, Cornell Steamboat Company, and the tugs for which the respondent appeared as claimant. To recover the damage to the barge and its cargo, the other libelant sued the same respondent and tugs and the same claimant appeared. The suits were consolidated for hearing and were argued together on appeal.

The decrees below were entered in favor of the libelants on the ground that under the conditions of wind and weather prevailing at the time the tugs took the tow out into the Tappan Zee it was negligence so to do which was the proximate cause of the damage. This was hotly contested by the respondent, who has argued from the fact that thirty-two boats were undamaged it follows that the barge must have been in some respect unseaworthy and that the breaking away of the pile driver is explained by the appearance of one of its lines which one witness, qualified as an expert, testified had been cut.

Except as to the severity of the weather and the cutting of the pile driver's line, there is little dispute of consequence in the evidence. The pile driver and its scow were on April 15, 1932, at McKeel's dock, Cold Spring, N. Y., and were wanted by their owner for use at Tarrytown. To get them there an order was given the dispatcher of the respondent by telephone, as was customary, and this order was accepted for execution the night of April 15th. Through a mistake, the towing was not then done and, instead, the boats were put by the respondent into a down-bound tow the following night. Though it cannot be said that the libelant approved the delay, it is clear that it acquiesced and that the towage when undertaken is to be considered as timely in accordance with the contract. The boats, however, were not dropped out of the tow when off Tarrytown and taken there, though an attempt to do so was made, but were carried down the river to the vicinity of Spuyten Duyvil because the weather and water off Tarrytown were considered unsafe for their transfer to the dock. Near Spuyten Duyvil the down-bound tow met a Cornell tow up-bound to which the pile driver and its scow were attached at Ludlow and then the down-bound and up-bound tugs exchanged tows. The tugs Sterling Tomkins and Edwin Terry started at 10:30 a. m. on April 17th back up the river with their new tow to the difficulty encountered in the Tappan Zee to which reference has already been made.

During their trip down through the Zee and on to Spuyten Duyvil, the captains of these tugs had, of course, had an opportunity to observe conditions. The wind had been so brisk and the waves in consequence so high that it had been thought prudent to avoid risk by replacing the pile driver in the tow after it had been once taken out for transfer to Tarrytown. On the way back the wind which was northwest changed but little. At the

weather station on the Whitehall building in New York where wind conditions would be, so it was proved, substantially as they were along the route of the tow, northwest storm warnings were hoisted at 10 a. m. on April 17th when the wind speed was 41 miles. By 10:44 a. m. the wind was blowing at 44 miles and increased a little before noon, attaining a maximum of 56 miles at 11:53. It lessened some throughout the afternoon at a fairly steady rate of decrease, though the maximum fluctuated from hour to hour until between 6 and 7 p. m. the wind movement was 36 miles with a maximum of 43 miles at 6:12, and during the following hour the wind movement was 28 miles with a maximum of 34 at 7:04. Before the tow entered Tappan Zee, it was sheltered from this wind by the high west bank of the river along the Palisades and had no trouble. Instead of waiting under this lee for the storm to abate further, the tugs went right out into the open waters of the Zee, where the tow met the full force of the wind and waves.

Before stating in more detail just what happened, it should be said that the barge No. 126, which was lost, was a steel barge about 120 feet long and 22 feet 6 inches wide, with a rounded bow and square stern and watertight compartments behind a bulkhead at either end. She had come down from Buffalo with a cargo of grain which was discharged at New York on December 30, 1935, and from January 4th to January 22d had been at 29th St. North River loading scrap iron. Having been loaded and her hatches battened down and covered with tarpaulin, she was taken to Dupont street, Brooklyn, where she lay until April 14th, when she was taken to Columbia street. During this time she was sounded every third day and found not to be leaking nor did she receive any injury before she was taken in tow by Cornell on the night of April 16th to the Cornell stakeboat at 35th St., North River, whence she started the next morning up the river. There was no evidence of any change in her condition nor of any occurrence which would probably have injured her before she was taken with the other boats out into the Tappan Zee. The pile driver and its scow were also shown to be seaworthy, with the possible exception of one line which will be mentioned later, when they were taken in tow by Cornell, and nothing was shown to have happened which would

have injured them before the tow went out of the shelter of the lee south of the Zee.

The tow which these tugs took into the rough water was some third of a mile long. Both tugs were pulling on hawsers ahead and when the pile driver, about 5:30 p. m., broke away, it drifted off unobserved by either tug, despite the fact that her whistle was blown ten or fifteen times. The reasons advanced for the failure of the tugs to notice the breaking away of the pile driver are that the tow was so long and the wind so ahead that the drifting did not disclose to the tugs any open water between the pile driver and the rear of the tow, and that the wind carried the sound of the whistle away from them. It is also suggested that even if the breaking away had been noticed the tugs could, under the prevailing circumstances, have done nothing to help.

At 6:45 p. m., about three-quarters of an hour after the pile driver went adrift, the tugs noticed distress signals made by waving a lantern on the barge No. 126. There was proof that the barge had been so signalling for twenty minutes. Some three-quarters of an hour later the barge sank at 7:40 p. m. and has never been raised. Meantime the helper tug transferred her line to the Tomkins and went back to assist the barge. Because of the fact that the lines to the Tomkins ran from the outer barges in the first tier and the No. 126 was inside the hawser barge on the right, the tug could not go alongside. Moreover, the water was too rough for the tug to lay alongside the outer barge and presumably too rough for her to have lain alongside the sinking barge even if she otherwise could have done so, and for these reasons, although she was equipped with a steam syphon in good working order, her hose was much too short to reach the sinking barge. All the tug did was to stand off the tow at a safe distance until the barge sank and call for the use of the barge's pumps, which by then were practically useless. It has been suggested that the filling of the barge might have been due to an uncovered hatch, but such pure speculation cannot be given any weight in the face of proof adequate to account otherwise for the sinking. After the barge went down, the tow was hauled to the shelter of Hook mountain and there rearranged.

The entries made by the captain in the log of the Sterling, Tomkins, throw so much

light on conditions when and after the barge sank that they deserve some attention. After setting forth the observance of distress signals at 6:45 p. m. and the sending of the "Edwin Terry back to see what was the matter," the log shows that at 7:40 p. m. the barge "swamped off Tarrytown light. Weather: clear. Wind: N.W.W. gale. Tide: flood with extra heavy seas. The captain of the Edwin Terry, Frank Tucker, also reported that the pile driver Pearsall No. 3 had broken adrift below Irvington and had been picked up by a Standard Oil tug and the scow that was with the pile driver was damaged. 8 P. M. to 10:-30 P. M. Ran under half speed under the lee of Hook Mt. waiting for the storm to abate." These entries may fairly be taken to show conditions, as they appeared to the captain who made them, at the time and shortly after the trouble occurred. They were no worse than when the lee was left, and in this respect the case differs from The Victoria (C.C.A.) 95 F. 184; and The Hercules (C.C.A.) 282 F. 615. Here the tugs had the choice of remaining in the lee, a circumstance of no great hardship, to keep their tow safe, or of taking it out into what were unquestionably rough waters. Ordinarily we should hesitate to substitute our judgment in this respect for that of experienced tugboat captains who testified that the weather was not too rough to go on. There was some direct evidence to the contrary, however, and the trial judge was supported by it in deciding that it was negligence to push on in the face of the storm. We are inclined to agree because no other conclusion seems reasonable in view of the fact that the choice between safety and danger was made when on the respondent's own evidence the tug captains should have known that if the pile driver did break away they either would not observe it because of the length of the tow or would not hear its distress signals because of the prevailing wind and so could or would do nothing to help, as, indeed, proved to be the fact. Thus they knew that they could not protect their tow in the event of serious trouble and were at fault for taking it unnecessarily into such danger. The Wyoming (D.C.) 58 F.(2d) 789. And similarly they should have known that if a barge situated as was the No. 126 began to fill they could not be of any assistance. Taking the respondent's evidence concerning what happened in the Zee at its face value, the conclusion is inescapable that the tugs exposed their tow to all the chances of high wind and waves under circumstances which made assistance, if needed, unlikely, if not impossible, and made a safe passage dependent mostly upon good luck. That makes it our duty to support the trial judge in his finding that the damage was due to the negligence of the tugs. Their conduct cannot be squared with prudent navigation upon all the evidence. The respondent's own evidence of conditions by which the inattention of the tugs to the tow after the trouble arose was sought to be excused itself shows what a hazardous undertaking it was. The negligent exposure of the No. 126 to the elements in the Zee is the only reasonable explanation of her sinking. Nor can the breaking away of the pile driver be otherwise explained except by some evidence as to one line which the trial judge did not take seriously and neither do we. It was to the effect that one of the lines by which she was attached to the tow was cut. The section claimed to have been cut was before the trial judge. It showed two strands of a six-inch manilla hawser parted and unfrayed. One witness testified that the rope had been cut by a knife edge and that the condition could not have been produced by pinching against the edge of the boat, but that opinion was not accepted by the trial judge, who had before him evidence that the rope had been renewed about six months before it parted and that it was in good condition when the pile driver was attached to the tow.

We have put nothing upon the failure of the tug captains to learn and heed the weather station reports. They knew what the weather was from the fact that they were out in it and they needed no warnings, for there was no sudden change. Moreover, it is true that in previous cases the view that navigators on the Hudson River need obtain and pay attention to storm warnings has not been favored, but it may be well to suggest that, in view of the ease of modern reception of weather reports by radio, the time may come when prudence will dictate that Hudson River tugs navigate with reference to such weather forecasts as may be so obtained.

Decrees affirmed.