208

## THE JERRY E.

## THE CLEVELAND.

### GOULD v. PENNSYLVANIA R. R.
#### No. 15519.

District Court, E. D. New York.
Nov. 21, 1939.

Purdy & Lamb and Edmund F. Lamb, all of New York City, for libellant.

Burlingham, Veeder, Clark & Hupper and Frederic Conger, all of New York City, for respondent-claimant.

GALSTON, District Judge.

The Jerry E, a deck scow loaded with a cargo of 468 tons of buckwheat coal, left South Amboy on May 14, 1938 at about 4:45 P. M. in tow of the tug Baltimore. There were eleven boats in the tow, the Jerry E having been placed in the last or third tier on the port side. On a previous trip the captain of the barge had taken the Jerry E from Edgewater with 444 tons of coal, which cargo was carried without difficulty.

The scow was equipped with a centrifugal pump and also a hand pump, both located at the stern starboard corner. The boat was trimmed to the pump, being a little deeper at the starboard stern corner. On the sounding at South Amboy the captain found three inches of water. It was testified that the centrifugal pump would suck about six inches down and the hand pump two inches. The boat was not pumped before leaving. The captain, along the way up the Kills, sounded the boat at a point in the neighborhood of Port Reading and found that she had about three and a half inches of water. The bargee then used the hand pump. At the Baltimore & Ohio bridge the tug Cleveland joined the tow on the starboard side along the second tier. The tow was landed at Northeast Harbor at about 10 or 10:30 P. M., at which time it was raining with strong wind prevailing. The strength of the wind prevented the tail end of the tow from coming round and held the tail at an angle toward the channel. After the tow was landed the tug Cleveland came alongside the Jerry E and its captain told Capps, the bargee, that he was going to take the Jerry E to Pier 10, Stapleton. The bargee protested on the ground that "it was no weather to tow in". Against the protest the captain of the Cleveland sent a deckhand over who then let the hawsers go and made fast to the side of the Cleveland. They proceeded to Pier 10, Stapleton. The Jerry E was taken on the port side of the Cleveland and was towed bow first with a line from the tug's bow bitts to the midship cleat on the starboard side of the Jerry E, a bow line from the tug to the bow starboard bitt of the scow, and a line from the port stern bitt of the Cleveland to the starboard stern bitt or stern of the Jerry E. Towed in this way the bow of the Jerry E was a little ahead of the bow of the tug, with the stern of the tug somewhat astern of the Jerry E. As the tow proceeded down Northeast Harbor into the open waters of New York Bay, approaching St. George, the weather was rough, the wind powerful, with increasingly heavier seas as they passed the ferries. The effect of wind and sea was to wash the sea over the bow up against the bulkhead, which caused a rocking and riding and jamming against the side of the tug, principally amidships. These contacts were heavy. The lines would slack and come up with a sudden slamming jolt. Reference is made to this condition of the voyage because the bargee said that it caused his midship cleat to start and open up the decks.

At a point abreast of Piers 9 and 10 at Stapleton the tug, because the first effort failed, rounded to twice to get to the head of the slip. The difficulty encountered caused the scow to slam against the side of the tug. Eventually the tug and the scow made the slip bow first with the port bow corner of the barge against the south side of Pier 9. The deckhand of the tug pulled the stern of the scow to the dock with the aid of tug, wind and sea. The master of the barge complained to the captain of the tug that the mooring was

not a fit place to leave the boat and that his bill of lading called for Pier 10, Stapleton, not Pier 9, to which the tug captain replied: "What difference does it make? Turecamo will be after you soon anyway." So the tug threw off its lines and went on its way, but not before the captain had been told by the barge master that the riding and jerking of the tow had started his midship cleat and opened up the decks. On sounding, ten inches of water were found. Though both pumps were used the water gained on the engine. Thereupon the master telephoned several times from the dock but failed to get a reply from libellant's office. Meanwhile the barge was riding and pounding against the dock for the seas were heavy, and the hatches were washed against the bulkhead. The water continued to gain. At this time a coast guard boat came along and sought to hold the barge to the dock. Later a police boat arrived, but finally, at about 6 A. M., the boat turned over, bottom up, with her starboard side toward the dock.

The police sergeant who saw the scow before she overturned, and the diver who examined her a couple of days later, support the bargee's version that the bow was pointed to the bay. This too would confirm the testimony of the scow captain that he was towed on the port side of the tug.

In the circumstances it was negligent on the part of the tug to attempt to tow from Northeast to Stapleton. The wind velocities were exceedingly great and aside from any storm warnings, the actual conditions prevailing at both Sandy Hook and New York, from 10 o'clock in the morning of May 17th presaged a hazardous trip. Those who proceed from a safe harbor into open waters in the face of such conditions must be charged with fault. The Robert H. Smith, D. C., 3 F.Supp. 531; The D. S. C. No. 311, D. C., 12 F.Supp. 493; The Stirling Tomkins, 2 Cir., 90 F. 2d 626; The Nannie Lamberton, D. C., 79 F. 121.

The fault thus ascribable to the Cleveland outweighs the contention of the claimant and respondent that the proximate cause of the barge's sinking was the negligence of her owner in failing to take proper steps to prevent her from sinking; nor can any negligence of the barge captain be ascribed as the proximate cause of the sinking of the barge. The presence of three inches of water in the barge at the pump on her trip from South Amboy immediately after loading was not beyond the capacity of the pumps, nor is there proof that the presence of such amount of water indicated leakage. The barge captain's testimony that the scow was making water through the seams on the starboard side amidships on the trip from Northeast to Stapleton is entirely credible.

The libellant may have a decree.

If this opinion is not in sufficient compliance with the rule requiring findings of fact and conclusions of law, submit findings of fact and conclusions of law in accordance therewith.