## LARSEN v. CAHILL TOWING LINE et al.

(Circuit Court of Appeals, Second Circuit. April 6, 1925.)

No. 337.

1. **Towage ☞19—Negligence of tug's master in proceeding to sea held sole cause of turning over of scow in tow.**

Turning over of scow in tow, resulting in drowning of scowman, *held*, under evidence, caused solely by negligence of tug's master in taking scow out from harbor to open sea, in defiance of displayed storm warnings and rising wind.

2. **Towage ☞19—Putting to sea in face of storm signals held negligence, not error of judgment.**

For master of tug, having scow with low freeboard in tow, to put out of harbor to open sea, with most unfavorable sea and strong increasing wind, disregarding displayed storm signals, when a harbor of refuge was at hand, *held* not an error of judgment, but negligence, though other scows, either much larger or having much higher freeboard, were out in tow of other tugs.

3. **Death ☞99(4)—$17,000 awarded for death of scowman.**

$17,000 awarded for death of scowman through negligence of tug, having scow in tow; he being 32 years old, having life expectancy of 34 years, earning $1,700 a year, and leaving widow and two young children.

Appeal from the District Court of the United States for the Eastern District of New York.

Libel in admiralty by Alice Larsen, administratrix of Alfred Larsen, deceased, against the Cahill Towing Line, impleaded with P. Sanford Ross. From a decree for libelant against the Cahill Company, but dismissing the libel as to the Ross Company, the Cahill Company appeals. Affirmed.

The opinion of the court below, by Campbell, District Judge, is as follows:

"The deceased, 32 years of age, having a wife and two daughters, aged, respectively, 5 and 9 years, was employed by the respondent, P. Sanford Ross, Inc., as an engineer on a derrick, but occasionally went out as scowman when it was necessary, and was thoroughly familiar with the duties of a scowman. He was earning about $1,700 a year, and his expectancy of life, as figured by the tables, was 33.92 years, if figured at 32 years, and 33.21 years, if figured at 33 years.

"The scow S–33, owned by the said respondent, was loaded on April 6, 1923, and had been brought down from Port Newark to Port Johnson a day or so before the 12th of April, 1923, and was loaded ready for sea. She was 125 feet long by about 40 feet wide. On that day a tug siphoned her out, which took about an hour.

"On April 13, 1923, at about 5 or 6 o'clock p. m., the regular scowman having gone out on a scow on April 12th, the deceased was ordered by his superior in the employ of the said respondent to go out as scowman on the said scow, which was to be towed out to sea for dumping that evening. When the deceased boarded the scow, he went down to look and see if there was water in the scow and returned and reported she was all right.

"The steam tug Princess, owned by the respondent Cahill Towing Line, Inc., took the said scow in tow about 8:20 p. m. She was on an even keel, with about 18 inches of freeboard forward. She had six pockets, and all were loaded, some of them below the coaming.

"The practice, as testified by the master of the Princess, is for the tug to siphon out the scow before leaving, if necessary; but she did not siphon out the scow on this occasion, presumptively because it was not necessary. The Princess had nothing to do with the loading.

"The deckhand of the Princess made fast the towing hawser to said scow, at a length of about 35 fathoms, and at 8:20 p. m. the tug got under way with her tow and passed through the Narrows at 9:25 p. m. The wind was then northeast and blowing 24 miles an hour at Sandy Hook, but at a much lower velocity at the Narrows. At the Narrows the length of the towing hawser was increased to 125 fathoms.

"A storm warning was displayed at the Sandy Hook station of the Weather Bureau by lanterns at 9:30 p. m., and the master of the Princess saw the warning at 10 p. m., when he was about at West Bank Light, and the wind was increasing. There was no barometer on the tug, and the master disregarded the storm warning and kept on.

"The maximum velocity of the wind at Sandy Hook on April 13th was 38 miles from the east at 10:16 p. m., which continued for five minutes. Between 10 and 11 p. m. the wind was from the east and blowing at 30 miles an hour, between 11 and 12 p. m. still from the east at 25 miles an hour, and between 12 midnight and 1 a. m. on April 14th still from the east and blowing at 24 miles an hour.

"The Princess, with the scow in tow, passed within a comparatively short distance of Sandy Hook and could have found a safe

harbor to the west thereof. An east wind is the most unfavorable wind for taking out scows for dumping, and the force of the wind increased, although its actual velocity was less, after leaving the shelter of the Hook. The sea was choppy, and it was not fit weather to take out a scow of the character of the S–33.

"The lights of the scow S–33 were last seen at 12:40 a. m. on April 14th, about one mile east of Scotland Light, when they disappeared. Within 10 minutes the Princess, after the light of the United States patrol boat Lamont had been thrown up and down on her three times, went around on a starboard wheel and looked, but could not find the scowman. The scow had turned over, but had not parted the hawser. The Princess then returned to the city with the overturned scow in tow.

"The master of the United States patrol boat Lamont, whose duty it was to examine all scows that were brought out to dump, had thrown his searchlight on the scow, and saw that all her pockets were loaded, that she set lower in the water forward than aft, and that the seas were going over one-half of the scow, but that she had no list. The Lamont was being operated very slowly at that time, not more than two miles an hour, or she would have been swamped.

"After examining the scow with her searchlight, the Lamont proceeded in a northerly direction for about 10 minutes to inspect another scow, and then headed out, but could not see the lights of the scow S–33. The Princess was still going, and the Lamont, with her searchlight, finally found the scow upside down and signaled the Princess as aforesaid.

"There were two other tows out at the same time, one a Great Lakes scow 250 feet long, the other of three scows of the same length as scow S–33, viz. 125 feet, but with more than 3 feet freeboard, instead of 18 inches, which made it much safer to take them out.

"There is no doubt that the deceased was aboard the scow at the time she turned over, because the master of the Princess saw the man on the scow when she left Port Johnson, and no landing was made, and no boat had communication with the scow to enable him to leave, and after the scow was towed back to Brooklyn the watch of the deceased was found in the cabin of the scow.

"There is no evidence to show that any act of the deceased in any way contributed to the turning over of the scow, and the sug-gestion of the master of the Princess that the door of the stern pocket of the scow appeared to be loose when the scow was towed to Brooklyn is in my opinion entitled to no weight, because he did not include any such statement in his report to the local inspectors, which was made shortly after the occurrence.

"I have given serious consideration to the claim of both the libelant and the respondent, Cahill Towing Line, Inc., that there was a presumption of the unseaworthiness of the scow S–33, because it took one hour for the tug to siphon her out on April 12th, and the owner, the respondent P. Sanford Ross, Inc., offered no evidence as to her condition, her age, and when she was repaired; but it seems to me that there was sufficient evidence to show she was seaworthy, because every one who saw the scow from before she was taken in tow until she was last seen, before she sank, including the master of the Princess and the master of the Lamont, who last saw the scow before she turned over and was laboring in the heavy, choppy sea, with the sea going over one-half of her, testified that she was on an even keel, and further because the deceased examined her, to find if there was any water in her, before she was taken in tow, and reported her all right.

"It is true that she, like scows of her class, had no hand or gasoline pumps, and could only be cleansed of water with a siphon; but the absence of a hand pump or gasoline pump did not, in my opinion, contribute to the turning over of the scow, because it was not shown that such accident was caused by water in the boat, or that such pumps could have been successfully used, if on the scow.

[1] "In my opinion, the turning over of the scow and loss of life of the deceased were caused solely by the negligence of the master of the Princess in taking out the scow in defiance of the storm warnings and the rising wind, which of itself was proof that the storm against which the warning was given had arrived.

[2] "This did not constitute an error of judgment on the part of the master, but negligence. While I realized that the judgment of the master in any given case is entitled to great weight, and that negligence will not be imputed simply because boats are moved in the harbor when storm warnings are given, still no master, when putting out of a harbor to the open sea, with the most unfavorable sea and a strong wind increasing in force and a boat with the low freeboard of the scow S–33, can arbitrarily

refuse to accept storm warnings seen by him when a harbor of refuge is at hand, and escape being found guilty of negligence on the ground that it was merely an error of judgment.

"In the instant case the master of the Princess arbitrarily disregarded the storm warnings given by the Weather Bureau, when he did not have aboard the most common instrument for determining changes of weather, a barometer, which, while probably not necessary on harbor-going tugs, in my opinion is absolutely necessary on a sea-going tug.

"The fact that two other tows were out does not, in my opinion, justify the act of the master of the Princess, because one scow was a much larger boat, and could reasonably be expected to withstand more severe seas and weather than the S–33, and the others were in like position because of their having a much higher freeboard, although of the same length as the S–33, and I do not understand that their failure to observe storm warnings furnished any excuse for the refusal of the master of the Princess to give attention to the same.

"The cases cited by the respondent Cahill Towing Line, Inc., are clearly distinguishable from the instant case, either because the warnings were not seen in time to have availed, or they were cases of harbor navigation, where the conditions are very different from those that prevail off the lightship. The deceased and the respondent P. Sanford Ross, Inc., were without blame, and the respondent Cahill Towing Line, Inc., was solely to blame.

[3] "A decree may be entered in favor of the libelant against the respondent Cahill Towing Line, Inc., for the sum of $17,000, with interest from date of death and costs, and in favor of the respondent P. Sanford Ross, Inc., dismissing the libel as to it, without costs."

Macklin, Brown & Van Wyck, of New York City (Horace L. Cheyney, of New York City, of counsel), for Alice Larsen.

William Butler, of New York City (George F. Hickey, of New York City, of counsel), for respondent-appellant.

Charles O. Truex, of Jersey City, N. J., (Paul Koch, of Jersey City, N. J., of counsel), for Sanford Ross, Inc.

Before ROGERS, MANTON, and HAND, Circuit Judges.

PER CURIAM. Decree affirmed on the opinion in the court below.

---

EBLING BREWING CO. v. CEREAL PRODUCTS CO.

(Circuit Court of Appeals, Second Circuit. May 4, 1925.)

No. 339.

1. Sales ⬥220—Assignment of sales contract held not assumption by assignee of any of its obligations.

Assignment of sales contract *held* not assumption by assignee of any of its obligations.

2. Frauds, statute of ⬥84—Contract whereby party agreed to accept malt under contract assigned to him, on condition of extension of time for delivery, required to be in writing as new contract and not modification of original.

Contract whereby defendant agreed to accept 1,000 tons of malt under a contract assigned to him by buyer, on condition that seller extend time for delivery, *held* one required to be in writing, as being new contract and not a modification of original contract.

3. Frauds, statute of ⬥106(1)—Letters held not sufficient recognition of contract.

Where plaintiff contracted to sell malt to W. company, which assigned contract to defendant without assumption of obligations by defendant, letters written plaintiff by defendant, informing it of assignment, asking acknowledgment of assignment, disclaiming liability when asked to remit price, but reserving right to call for malt if desired, and informing plaintiff of its own assignment of the contract, did not recognize alleged contract to take malt in consideration of extension of time so as to satisfy statute.

4. Frauds, statute of ⬥106(1)—Promise or recognition of promise by which party is to be charged must appear from document as a whole.

Promise or recognition of promise by which party is to be charged must appear from document as a whole.

In Error to the District Court of the United States for the Southern District of New York.

At Law. Action by the Cereal Products Company against the Ebling Brewing Company. Judgment for plaintiff, and defendant brings error. Reversed.

Louis Salant, of New York City, for plaintiff in error.

Guggenheimer, Strasser & Meyer, of New York City (David L. Podell, Charles H. Meyer, and Mortimer Hays, all of New York City, of counsel), for defendant in error.

Before HOUGH, MANTON and HAND, Circuit Judges.

HAND, Circuit Judge. The action was for damages for breach of contract in refusing to accept delivery of 1,000 tons of