**THE D. S. C. NO. 311.**

**THE M. MORAN.**

District Court, S. D. New York.
July 12, 1935.

Paul Windels, Corp. Counsel, of New York City (P. Fearson Shortridge and John T. Condon, both of New York City, of counsel), for libelant.

Macklin, Brown, Lenahan & Speer, of New York City (Richard F. Lenahan, of New York City, of counsel), for claimant.

GODDARD, District Judge.

This suit is brought by the city of New York to recover damages sustained when its dumper scow No. 311 was stranded in the vicinity of Sandy Hook on the morning of January 1, 1932, after breaking adrift from a tow of the tug Moran owned by the claimant, the Moran Towing & Transportation Company, and for the loss of the personal effects of the two members of the crew of the scow.

In the late afternoon of December 31, 1931, the Moran left Thirty-Fifth street and East River with three loaded dumper scows in tow bound for the dumping ground at sea, which is located twelve miles southeast of Scotland Light Ship. The tow was arranged in tandem, the dumper No. 305 ahead, followed by dumper No. 302, and then the No. 311. After passing through the Narrows the hawsers were lengthened out to 300 fathoms between the tug and the No. 305, and to 100 fathoms between the following scows. The flotilla proceeded down Swash Channel and when off the entrance to Gedney Channel altered its course to the east so as to pass clear of Scotland Light Ship, and arrived at the dumping ground about 5:20 a. m. on January 1. The wind had freshened gradually and continued to increase when the tow turned to come back. Upon reaching the shallow water off Sandy Hook, the flotilla encountered rough heavy seas. At 8:45 the hawser between the first and second scows parted, and the two after scows went adrift. The Moran, with one scow in tow, picked up the two drifting scows and made them fast on an emergency hawser from her port quarter, with the No. 311 astern of the No. 302. Around 9:30 a. m. the hawser to the No. 311 parted and she drifted in shore towards Sandy Hook. The captain of the Moran, after making some effort to pick up the drifting scow, gave it up as it was drifting too fast to overtake it with the other two scows in tow, and because he thought it dangerous to get into the shallow water. The Moran proceeded up into the harbor. After drifting for twenty to thirty minutes the No. 311 fetched up on the strand and finally, after turning end for end along the beach in the surf, drifted clear of the point of Sandy Hook and into comparatively smooth water behind the Hook where she anchored, and her crew was taken off by the Coast Guard.

The Moran is an ocean-going tug, 120 feet long, with a crew of 14. The dumper scows are 125 feet long and 38 feet wide, 12 feet from deck to keel; when light, are about 9 feet out of water, but above the decks are the pockets which are 8 feet high, so that there is a surface of about 17 feet exposed to the wind. Each scow is equipped with a 700-pound anchor and 300-foot cable, and carries two men.

The uncontradicted testimony is that the hawsers which broke were 8½ or 9 inches in diameter and in good condition, purchased about the first of August of that year; that they had been in use for three or four months, and that the life of such a hawser in continual use under ordinary conditions is nine to ten months.

Until between 8 and 9 p. m. of December 31, the weather was clear and the velocity of the wind was 20 miles an hour and the barometer had been rising. At 9:30 p. m. the United States Weather Station at Sandy Hook displayed two red lights, the signal for a northeast storm. This signal was exhibited from a tower 80 feet high, and the lights are electric with a visibility of about 5 miles under the conditions which existed at the time the Moran and her tow passed. The captain of the Moran testified that at 9:15, when he looked, the storm signal was not there and he did not look again. From the course taken by the Moran, it appears that at the speed she was proceeding the storm warning lights were, at 9:30, the time they were set, on her starboard quarter about 2½ miles distant; at 10 p. m. they would have been 10 points abaft the starboard beam and 3 miles distant; at 11:30 p. m., when the tug and her tow were astern of Scotland Light Ship, they would have been about 6 points abaft the Moran's starboard beam and less than 5 miles distant.

The mate of the scow No. 305 and the captain of the scow No. 311 said that on the way out, when the tow had gotten a little past Sandy Hook, they saw the two red lights of the signal station. The captain of the Moran testified that if he had seen the storm warnings, he would have turned back and not proceeded out to the dumping ground; that although he knew that the storm signals were usually set some time between 9 and 10 o'clock, morning and evening, he did not turn around to look for the signal after 9:15.

The claimant seeks to excuse itself for the loss of the Moran's tow No. 311 on the ground of inevitable accident. So it must either point out the precise cause and show that it was not in any way negligent in connection with the loss, or it must show all possible causes and that it was not at fault in respect with any of them. In re Reichert Towing Line (C. C. A. 2), 251 F. 214, certiorari denied 248 U. S. 565, 39 S. Ct. 9, 63 L. Ed. 424.

The breaking adrift first of the No. 302 with the No. 311, and a little later the No. 311 alone, was plainly due to the fact that the hawsers were unable to stand the great strain upon them by the tossing and plunging scows with their high sides exposed to the easterly wind, which sweeps across the lower bay and causes a heavy rough sea in the vicinity of Sandy Hook, where the water is shallow.

The claimant has not explained why the hawser, which it furnished, parted and resulted in the stranding of the No. 311. Under the circumstances, the claimant must show that it was not at fault if it is to clear itself of liability. Cranberry Creek Coal Co. v. Red Star Towing Co. (C. C. A. 2), 33 F.(2d) 272, certiorari denied New York Marine Co. v. Red Star Towing Co., 280 U. S. 596, 50 S. Ct. 67, 74 L. Ed. 643. In re Reichert Towing Line (C. C. A. 2), 251 F. 214, certiorari denied 248 U. S. 565, 39 S. Ct. 9, 63 L. Ed. 424; The Edmund Moran (C. C. A. 2) 180 F. 700.

The explanation of the claimant seems to be that the heavy seas caused the hawser to part. But it was not a sudden storm of unusual intensity without warning; it was quite the ordinary winter storm. The hourly average of the wind did not exceed 27 miles an hour and did not reach a maximum of 34 miles an hour prior to the parting of the No. 311's hawser. That an easterly storm is likely to cause such conditions of wind and sea in that vicinity is well known to mariners familiar with those waters, including the captain of the Moran. I doubt if the conditions of wind and sea, which the Moran met with, were so severe or unusual as to make out a case of inevitable accident, but if they were too much for her and her tow to weather, she failed to use reasonable precaution to avoid getting into that situation. A warning of a northeasterly storm was hoisted at the United States Weather Station located at Sandy Hook at 9:30 on December 31. The master of the Moran said that at 9:15, when off the station, he looked and saw no storm warning; that although he knew that

it was customary for weather signals to be set some time between 9 and 10 o'clock, morning and evening, he did not look again nor did any one else on the tug. Had he looked at 9:30 or later, he would have seen the signal, for it was seen by men on two of the scows. The captain of the Moran says that if he had seen the signal he would have turned back and not put out to sea.

If the course of the Moran and her tow be laid down on the chart, it is plain that the warning signal would have been fully visible to those navigating the Moran, for some time after it was set if they had looked in the direction of the signal station. I think they did not make a fair effort to inform themselves as to the weather conditions to be expected. There is little difference in so far as the result is concerned in failing to use reasonable diligence to observe storm warnings and in disregarding them. The failure in either respect is evidence of a failure in that ordinary care and skill, which is a tug master's duty when about to proceed to sea with a tow of scows. Larsen v. Cahill Towing Line (C. C. A. 2) 6 F.(2d) 982; The Mercury (C. C. A. 1) 2 F.(2d) 325; Nicholson v. Erie R. Co. (C. C. A. 2) 255 F. 54.

Claimant also contends that the proximate cause of the stranding of the No. 311 was her failure to anchor as soon as the hawser parted. She carried a 700-pound anchor and 300 feet of cable. For this defense to prevail, the claimant must show that dropping the anchor would have avoided the loss. The Revere (C. C. A. 2) 63 F. (2d) 775.

The crew of the No. 311 testified that under the conditions it would have been unsafe for them to go on the bow of the scow and attempt to let go the anchor; that they would have been washed overboard. They also say that the anchor would have caused greater damage to the scow by holding her on the beach where she would have pounded and broken up. Aside from this, two members of the Coast Guard, who had been stationed on the Jersey Coast for a number of years, testified that it would have been unwise to have dropped the anchor, because if she dragged her anchor, as she probably would have, and gone on the beach, she would have been likely to have become a total loss, and if it did hold, the seas would have pounded her and caused serious damage; that she probably was less damaged by drifting into the quieter water protected by Sandy Hook Point where she did anchor.

It has not been shown that the damage to the No. 311 would have been avoided by her anchoring sooner.

Libelant may have a decree with the usual reference as to damages.